Filed 1/4/23  In re D.H. CA2/8

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| In re D.H., a Person Coming Under the Juvenile Court Law. | B319200 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | (Los Angeles County Super. Ct. No. 20LJJP00049A) |
| Plaintiff and Respondent, | |
| v. | |
| T.H., | |
| Defendant and Appellant. | |

APPEAL from findings and order of the Superior Court of Los Angeles County, Stephanie M. Davis, Referee.  Affirmed.

Lori N. Siegel, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, Acting County Counsel, Kim Nemoy, Assistant County Counsel, and Jane E. Kwon, Principal Deputy County Counsel, for Plaintiff and Respondent.

# INTRODUCTION

T.H. (Mother) challenges the juvenile court's March 18, 2022 findings and order terminating her parental rights to her 12-year-old son, D.H. On appeal, she does not contest the merits of the court's order; instead, her sole contention is that reversal is warranted because the juvenile court and Department of Children and Family Services (DCFS) failed to satisfy the initial inquiry requirements under the Indian Child Welfare Act of 1978 (ICWA) (25 U.S.C. § 1901 et seq.) and related California law (Welf. & Inst. Code,[1] § 224 et seq.).

While we agree with Mother that DCFS did not properly discharge its statutory duty, resulting in "ICWA error," we conclude any such error was harmless and affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

I.  *Events Leadings to Filing of Petition*

In December 2019, DCFS received two immediate response referrals with allegations of "general neglect and caretaker absence/incapacity" by Mother towards D.H. It was reported Mother was not in compliance with her psychotropic medications and was hospitalized due to her anxiety and pain. Mother's and D.H.'s home was "observed to be a mess and a 'hoarder's home.'" D.H. stated he "takes care of himself and [his] mother" and he was concerned they may be evicted "because of their living conditions." D.H. expressed concern about his Mother's repeated 911 calls due to her anxiety attacks. D.H. reported that when Mother goes through her "anxiety stuff," he "takes care of himself

---

[1]    Further undesignated statutory references are to the Welfare and Institutions Code.

2

and the mother"; he said this happens at least once a month and could last up to a week. D.H. reported his school "asked him not to come back . . . due to the excessive amount of absences he had." It appeared the "minor was really raising himself."

On December 24, 2019, a children's social worker (CSW) observed the apartment and found it "in disarray" with a strong odor of trash permeating the home. There were "multiple pots, pans and dirty dishes overflowing from the sink and piled up" in the kitchen, "boxes and miscellaneous items cluttering the pathway" to Mother's bedroom; "the room is so cluttered that it does not appear that it is used for sleeping." D.H.'s room had "trash all over the side of the room."

Mother suffers from Alpha-1 antitrypsin deficiency which causes her breathing difficulties. She currently takes the following medication: albuterol inhaler, symbicort inhaler, trelegy, daliresp, fluticasone, azelastine, water pills, sudogest, hydroxyzine, Cymbalta, escitalopram, and clonazepam. Mother has a "history of coming into the hospital due to her anxiety and mental health."

The identity of D.H.'s father is unknown. According to the maternal aunt April (MA April), Mother lost custody of D.H. in 2014 in the state of Oregon where they resided at the time. Mother stated her son was taken from her because "they said I was mentally unstable." Mother said she signed papers "under duress" that allowed D.H. "to be taken away." Maternal cousin Michael (MC Michael) had custody of D.H. from 2014 to 2015. When Mother moved to California, D.H. "was given to" maternal aunt Lori (MA Lori) to live "closer to his mother" and, at some later point, was returned to Mother's care and home. MA April

stated "things took a negative turn" for Mother about one year ago when she lost both her parents (maternal grandparents).

On January 21, 2020, the CSW learned D.H. last attended middle school from August 2019 to September 2019, and "has not been enrolled in a school for over four months now." DCFS found prior child welfare history pertaining to D.H. A referral of general neglect of D.H. was made in November 2018 because of Mother's hospitalization, positive test for methamphetamine, and placement on a 72-hour psychiatric hold; the referral was closed as unfounded. DCFS also discovered Mother has past arrests related to drug charges and past convictions for traffic violations.

## II.     *Petition and Detention*

On January 27, 2020, DCFS filed a petition on behalf of minor D.H., born June 2007, pursuant to section 300, subdivision (b)(1). The petition alleged Mother has "mental and emotional problems, including anxiety, depression, paranoia, and panic attacks" which render her unable to provide D.H. with regular care and supervision. On prior occasions, Mother was hospitalized for evaluation and treatment of her psychiatric condition. Mother failed to take her psychotropic medication as prescribed and failed to regularly participate in services to address her mental and emotional problems. It was alleged Mother's problems endangered D.H.'s physical health and safety, created a detrimental home environment, and placed him at risk of serious harm and danger.

The petition included an "Indian Child Inquiry Attachment" (Judicial Council form ICWA-010(A)) which provided that an Indian child inquiry was "made" and that D.H. "has no known Indian ancestry." The attachment also indicated Mother "denied" any known Native American ancestry.

4

On January 22, 2020, Mother denied any known Native American ancestry. Mother stated the identity of the father is unknown. DCFS has "no means to assess if there may be any paternal Indian heritage."

On January 28, 2020, Mother filed her Parental Notification of Indian Status (Judicial Council form ICWA-020) and marked the box indicating "no Indian ancestry as far as I know."[2]

At the initial hearing on January 28, 2020, the juvenile court reviewed the ICWA-020 form filed by Mother. The court stated, "Mom's filed an Indian Child Welfare statement indicating she has no American Indian heritage." The court provided it "does not have a reason to know that [D.H.] is an Indian Child . . . and does not order notice to any tribe or the BIA." Mother was ordered to keep DCFS and the court aware of "any new information relating to possible ICWA status." As to D.H.'s father, the juvenile court stated the identity is unknown and it "can make an ultimate finding today that the Indian Child Welfare Act does not apply." The court ordered D.H. released to

---

[2] The form includes four other checkboxes that provide:

a) "I am or may be a member of, or eligible for membership in, a federally recognized Indian tribe."
b) "I may have Indian ancestry."
c) "The child is or may be a member of, or eligible for membership in, a federally recognized Indian tribe."
d) "One or more of my parents, grandparents, or other lineal ancestors is or was a member of a federally recognized tribe."

Mother left these checkboxes blank.

5

Mother's home and ordered DCFS to make unannounced home visits and to assist Mother in enrolling D.H. in school.

The detention report filed February 28, 2020, states that during an unannounced home visit on February 19, 2020, the CSW observed Mother and son at their apartment, which was "in disarray with trash, clothes, boxes, a Christmas tree, dishes and numerous other things all over the place." The CSW noted there "was a small walkway to wade through the debris." Mother had "numerous feet of oxygen tubing lying all over the home that connected her to oxygen tanks," which she needs to ease her breathing difficulties. When asked if she had registered her son at school as ordered by the court, Mother gave excuses, was very disorganized in her thought process, and could not finish a sentence or express her thoughts. The CSW next spoke with D.H., who stated Mother "was not doing good" and was "not taking her medication." He reported Mother "kept waking him up saying she heard noises and she thinks the apartment building is going to collapse." He also reported Mother calls the paramedics "4–5 times a day because she is anxious."

On February 28, 2020, DCFS filed a section 385 ex parte application requesting the court to detain D.H. and place him in shelter care. Mother failed to enroll D.H. in school, failed to take prescribed medication, and was now hospitalized and incapacitated. D.H. was taken into protective custody; there was no suitable plan for D.H.'s care "as the potential relative caregivers [that Mother proposed] are unable to provide care."

On March 2, 2020, the juvenile court granted the application, ordered D.H. removed from Mother's home, and gave DCFS discretion to place him with an appropriate relative. Mother was granted unmonitored visits in a public setting for a

maximum of two hours per visit, three times a week. DCFS was ordered to enroll D.H. in school forthwith.

On March 10, 2020, D.H. expressed to DCFS that he does not wish to have visitation or telephone contact with Mother.

On March 17, 2020, the CSW asked MA April if she or MA Lori could care for D.H. MA April stated both she and MA Lori work full-time and could not care for D.H. MA April proposed family friends (Mr. and Mrs. R)[3] for D.H.'s placement.

III.    *Jurisdiction and Disposition*

In an addendum report filed August 11, 2020, DCFS informed the court Mother enrolled in a 16-week virtual parent education class and has attended three sessions to date. Mother indicated she started counseling three weeks ago, and she meets with her psychiatrist once every three months. Meanwhile, D.H. continued staying at Mr. and Mrs. R's home, where he stated he was "very happy."

Adjudication took place on August 12, 2020. The juvenile court repeated its earlier finding that ICWA did not apply. It sustained the section 300 petition as alleged and declared D.H. a dependent of the court. The court ordered "suitable placement" of D.H. and reunification services. Mother's case plan included individual counseling, parenting classes, on-demand drug testing, mental health counseling, a psychological assessment, and a psychiatric evaluation. Mother was ordered to take all prescribed psychotropic medication. She was afforded monitored visitation for three hours a visit, three times a week.

---

[3]     Mr. and Mrs. R are parents of a friend of D.H. D.H. has known them since the fourth grade.

7

IV.    *Section 366.21 Status Review Hearings*

In the status review report filed January 21, 2021, DCFS informed the court that D.H. adjusted "very well" at Mr. and Mrs. R's home and was doing well in school.  DCFS reported Mother was not cooperative and refused to meet with the CSW or provide documentation of progress with her case plan.

At the section 366.21, subdivision (e) hearing held February 11, 2021, the juvenile court found Mother had not made substantial progress in her case plan and that returning D.H. to Mother's care would create a substantial risk of detriment to his well-being.

On March 2, 2021, Mother's psychiatrist noted Mother was "not medication compliant."  Mother's therapist disclosed Mother had not had a session since September 2020.  The CSW reported Mother's mental health concerns "get in the way of every aspect of her life including remaining on task."  There was a five-month gap between her individual counseling sessions from September 17, 2020, to February 1, 2021.  The CSW interviewed D.H., who expressed his wish to be adopted by his caregivers and to continue visits with Mother.

At the section 366.21, subdivision (f) review hearing held October 21, 2021, the juvenile court found Mother "has not adequately addressed the issues that brought this family before the court."  It found Mother was noncompliant with her case plan and inconsistent with her individual counseling or therapy appointments.  Mother "has not made significant progress in resolving the problems that lead to the removal of the minor and . . . has not demonstrated the capacity and ability to complete the objectives of the treatment case plan."  Minor's counsel informed the court of 14-year-old D.H.'s wishes that reunification services

be terminated, so that D.H.'s "case can move forward" to permanent planning.

The court did not find enough evidence to support reunification services for Mother and found it was not in D.H.'s best interests to continue with reunification efforts. The court terminated reunification services. The court found returning D.H. to Mother's physical custody would create a substantial risk of detriment to D.H.'s well-being and safety and ordered the current placement to continue.[4] DCFS was ordered to provide information about adoption and guardianship to D.H. and his caregivers and to set-up an adoptive home study. The matter was set for a section 366.26 hearing to select and implement a permanent plan of adoption or guardianship for D.H.

V.    *D.H.'s Section 388 Petition to Modify Visitation*

On January 28, 2022, D.H. filed a section 388 petition asking the court to "minimize in-person visits because to date, [Mother] does not engage with him during the visits" and it is "awkward and full of silence." D.H. asked that visitation be "primarily virtual" and "shorter in length."

A report DCFS submitted February 10, 2022, informed the court that Mr. and Mrs. R's home study was approved and all adoption readiness documents had been obtained. There were "no impediments to moving forward with [D.H.'s] adoption."

At the February 18, 2022, hearing on D.H.'s section 388 petition, the court found "no evidence" that the last two years of court-ordered visitation "benefited either the minor or the mother in creating a bond between the two." The court granted D.H.'s

_____

4    D.H. had resided with Mr. and Mrs. R since August 10, 2020, almost one year.

9

petition and modified visitation to "predominantly virtual," reducing it to 30 minutes per visit, three times a week. The court encouraged Mother to use visitation time to initiate "exchanges of ideas and conversation with [D.H.] about him and his life in order to form a bond."

VI.     *Section 366.26 Selection of Permanent Plan Hearing*

At the section 366.26 permanency planning hearing held March 18, 2022, the court found D.H. adoptable. Mother "has not maintained regular visitation" and "has not established a bond with" D.H. The court found no exception to adoption and ordered adoption as the "permanent plan." The court found it would be "detrimental" to D.H. to return to Mother. The court repeated it "previously made Indian Child Welfare Act findings and those do remain in full force and effect." The court then proceeded to terminate Mother's and the unknown father's parental rights to D.H. Custody of D.H. was ordered temporarily transferred to DCFS to effectuate adoptive planning and placement. The court designated Mr. and Mrs. R as D.H.'s prospective adoptive parents.

Mother timely filed a notice of appeal.

## DISCUSSION

The sole issue raised by Mother on appeal is whether DCFS and the juvenile court complied with ICWA as "no inquiry was made of extended relatives as to whether [D.H.] has possible Indian ancestry in violation of ICWA mandates." Mother argues DCFS was in contact with several maternal relatives and easily could (and should have) asked whether there was Indian ancestry or reason to believe [D.H.] is an Indian child. She contends

10

substantial evidence does not support the court's finding that ICWA did not apply.

While we agree with Mother that DCFS did not properly discharge its statutory duty, resulting in "ICWA error," we conclude any such error was harmless and we affirm.

I.     *Standard of Review*

"[W]here the facts are undisputed, we independently determine whether ICWA's requirements have been satisfied." (*In re D.S.* (2020) 46 Cal.App.5th 1041, 1051 (*D.S.*); accord, *In re A.M.* (2020) 47 Cal.App.5th 303, 314 (*A.M.*).)  However, "we review the juvenile court's ICWA findings under the substantial evidence test, which requires us to determine if reasonable, credible evidence of solid value supports the court's order. [Citations.]  We must uphold the court's orders and findings if any substantial evidence, contradicted or uncontradicted, supports them, and we resolve all conflicts in favor of affirmance."  (*A.M.*, at p. 314; accord, *In re Austin J.* (2020) 47 Cal.App.5th 870, 885 (*Austin J.*).)  The appellant—in this case, Mother—has the burden to show the evidence was not sufficient to support the ICWA finding.  (*Austin J.*, at p. 885.)

II.    *Applicable Law*

ICWA[5] reflects "a congressional determination to protect Indian children and to promote the stability and security of Indian tribes and families by establishing minimum federal standards that a state court . . . must follow before removing an

---

[5]     Our state Legislature incorporated ICWA's requirements into California statutory law in 2006.  (*In re Abbigail A.* (2016) 1 Cal.5th 83, 91.)

Indian child from his or her family." (*Austin J.*, *supra*, 47 Cal.App.5th at p. 881.) Both ICWA and the Welfare and Institutions Code define an "Indian child" as "any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe." (25 U.S.C. § 1903(4); § 224.1, subds. (a) & (b) [incorporating federal definitions].)

The juvenile court and DCFS have "an affirmative and continuing duty to inquire whether a child for whom a petition under Section 300 . . . may be or has been filed, is or may be an Indian child." (§ 224.2, subd. (a); see *In re Isaiah W.* (2016) 1 Cal.5th 1, 9, 11–12.) This continuing duty can be divided into three phases: the duty of initial inquiry, the duty of further inquiry, and the duty to provide formal ICWA notice. (*In re D.F.* (2020) 55 Cal.App.5th 558, 566.) It is the first phase, the duty of initial inquiry, that is at issue here.

The *duty to inquire* whether a child is an Indian child begins with "the initial contact," i.e., when the referring party reports child abuse or neglect that jumpstarts DCFS investigation. (§ 224.2, subd. (a).) DCFS's initial duty to inquire includes asking the child, parents, legal guardian, extended family members, and others who have an interest in the child whether the child is, or may be, an Indian child. (*Id.*, subd. (b).) Similarly, the juvenile court must inquire at each participant's *first* appearance before the court whether he or she "knows or has reason to know that the child is an Indian child." (*Id.*, subd. (c).) The juvenile court must also require each parent to complete Judicial Council Form ICWA-020, Parental Notification of Indian Status. (Cal. Rules of Court, rule 5.481(a)(2)(C).) The parties are

instructed to inform the court "if they subsequently receive information that provides reason to know the child is an Indian child." (25 C.F.R. § 23.107(a); § 224.2, subd. (c).)

III. *Analysis*

Here, Mother argues the juvenile court and DCFS failed to conduct their duty of initial inquiry to gather information that *could have* triggered additional duties and heightened requirements. (*In re Benjamin M.* (2021) 70 Cal.App.5th 735, 742.) Mother essentially argues DCFS and the juvenile court should not have accepted at face value Mother's multiple statements that she had no Indian heritage; instead, DCFS should have asked maternal aunts April and Lori and maternal cousin Michael—Mother's "available extended family members"— what they knew about possible Indian heritage.

As the facts before us are not disputed, we independently determine whether ICWA's requirements were met. (*D.S.*, *supra*, 46 Cal.App.5th at p. 1051.)

In the case before us, the juvenile court conducted its initial inquiry as to whether D.H. is an Indian child during Mother's *first appearance* at the January 28, 2020, initial hearing. (§ 224.2, subd. (c) ["At the first appearance in court of each party, the court shall ask each participant present in the hearing . . . ."].) The court reviewed the ICWA-020 form submitted by Mother and noted, "Mom's filed an Indian Child Welfare statement indicating she has no American Indian heritage." The court ordered Mother to keep DCFS and the court aware of "any new information relating to possible ICWA status." As to D.H.'s father, the juvenile court found his identity unknown and that it "can make an ultimate finding today that the Indian Child Welfare Act does not apply."

13

Section 224.2, subdivision (b) imposes on DCFS a duty of initial inquiry, i.e., to ask "extended family members"[6] whether the child may be an Indian child. Mother contends DCFS failed in its duty to inquire because DCFS did not ask D.H.'s extended family relatives—MA April, MA Lori, MC Michael—about possible Indian ancestry.

We agree with Mother. DCFS's failure to ask MA April, MA Lori, and MC Michael—all of whom DCFS was in contact with throughout the proceedings—about any possible Indian ancestry violated the express mandate of section 224.2, subdivision (b). (See *In re Antonio R.* (2022) 76 Cal.App.5th 421, 431–432; *In re Benjamin M.*, *supra*, 70 Cal.App.5th at p. 742.) The court erred in finding that ICWA did not apply.

The next question is whether the error was harmless. A violation of section 224.2 is a violation of state law which requires reversal only if it has caused a "miscarriage of justice under California Constitution, article VI, section 13." (*In re Y.M.* (2022) 82 Cal.App.5th 901, 910.) Our colleagues in Division Two issued an opinion earlier this year where it proposed and adopted a new rule for harmlessness. (*In re Dezi C.* (2022) 79 Cal.App.5th 769, 777–778, review granted Sept. 21, 2022, S275578.) "[A]n agency's failure to conduct a proper initial inquiry into a dependent child's American Indian heritage is harmless *unless the record contains information suggesting a reason to believe that the child may be an 'Indian child' within the meaning of [the] ICWA*, such that the absence of further inquiry was prejudicial to

---

[6] "Extended family members" include the child's "grandparent, aunt or uncle, brother or sister, brother-in-law or sister-in-law, niece or nephew, first or second cousin, or stepparent." (See 25 U.S.C. § 1903(2) and § 224.1, subd. (c).)

14

the juvenile court's ICWA finding.  For this purpose, the 'record' includes both the record of proceedings in the juvenile court and any proffer the appealing parent makes on appeal." (*Id.* at p. 779, italics added.)  We agree with our colleagues in *In re Dezi C.* that by limiting a remand for further inquiry to those cases in which the record gives the reviewing court a reason to believe that the remand may undermine the juvenile court's ICWA finding, the "reason to believe" rule effectuates the rights of the tribes in those instances in which those rights are most likely at risk, which are precisely the cases in which the tribe's potential rights do justify placing the children in a further period of limbo.  (*Id.* at pp. 781–782; *In re G.A.* (2022) 81 Cal.App.5th 355, 363–364 [endorsing approach taken in *In re Dezi C.*].)

There is nothing in the record to suggest further contact with Mother's relatives might contradict the unqualified statements by Mother that the family did not have Indian heritage.  DCFS spoke with Mother prior to filing the section 300 petition, which included the "Indian Child Inquiry Attachment" indicating an inquiry was made and Mother denied Native American ancestry.  Mother filed her "Parental Notification of Indian Status" stating she has "no Indian ancestry."  Mother also denied Native American ancestry to the CSW on January 22, 2020.  At no time during the two years of proceedings did Mother claim Indian ancestry.  Despite multiple opportunities to do so over the course of the dependency case, Mother never suggested that a family member might know more about their ancestry. There was no evidence whatsoever of any Indian tribal link. "Simply put, no information was *ever* supplied 'suggesting that either the parent of the child or the child is a member or may be

15

eligible for membership in an Indian tribe.' " (See *In re G.A.*, *supra*, 81 Cal.App.5th at p. 363.)

Error committed by DCFS or the juvenile court in not asking the three identified extended relatives (MAs and MC) prior to the termination hearing was harmless. We find it appropriate to remand only where the record shows " 'a reason to believe that the child may be an "Indian child" within the meaning of [the] ICWA.' " (See *In re G.A.*, *supra*, 81 Cal.App.5th at p. 363; see *In re Kenneth D.* (2022) 82 Cal.App.5th 1027, 1035.) Mother cannot establish prejudicial error under this test.

We affirm.

## DISPOSITION

The findings and order terminating parental rights are affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

STRATTON, P. J.

I concur:

HARUTUNIAN, J.*

---

* Judge of the San Diego Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

16

**WILEY, J., Dissenting**.

The Department with little effort could have asked the maternal relatives the required question about ancestry but did not and thereby added needless delay and uncertainty to a situation that would benefit from swift and definite resolution. Perhaps someday this issue will vanish when the Department becomes convinced it should follow the law.

This is my 15th dissent on this issue.


WILEY, J.